UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SAK CONSTRUCTION OF CA, L.P.,      )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )        Case No. 4:11CV01479 ERW
                                   )
PSC INDUSTRIAL OUTSOURCING, L.P.,  )
                                   )
        Defendant.                 )

**MEMORANDUM AND ORDER**

This matter comes before the Court on Plaintiff SAK Construction of CA, L.P.'s ("SAK")

Motion for Summary Judgment [ECF No. 23].

**I. BACKGROUND FACTS[1]**

SAK, a Missouri limited company, is a contractor on the Los Coyotes Water Reclamation

Plant Interceptor Project, Phase II ("Project") that is being constructed in Los Angeles County,

California, for the County Sanitation Districts of Los Angeles County (the "District"). Defendant

PSC Industrial Outsourcing, L.P. ("PSC"), a Delaware limited partnership, provides various pipe

cleaning, inspection and other services at locations across the United States. SAK filed a

Complaint against PSC, asserting claims for breach of contract and unjust enrichment in

connection with the Project construction work [ECF No. 4].

---

[1]The Court's recitation of facts comes from those shown to be undisputed by the parties'
responses to allegations contained in the Complaint, Plaintiff's Statement of Uncontroverted
Material Facts, Defendant's Statement of Additional Material Facts, and from unrefuted exhibits
in the record [ECF Nos. 1, 4, 5, 25, 28, 31, 32].

SAK installs a technology referred to as "cured-in-place pipe" ("CIPP") to repair deteriorated or damaged pipes and water distribution pipeline systems.  CIPP products allow SAK to rehabilitate a damaged sewer or pipeline system without requiring the digging of trenching.  SAK's business involves installing liners into sewer pipes that are deemed in need of repair.  These liners are inserted into the pipe, providing support and preventing replacement of the pipe.  SAK's technology reduces problems associated with infiltration; leakage; and deteriorating water, sanitary and storm sewer infrastructure, with minimal surface disruption. Before SAK can implement its technology in any storm sewer system, however, the sewer pipe or siphon to which the rehabilitating CIPP lining will be applied must be cleared of all debris and cleaned.

PSC carries out various forms of large-scale industrial cleaning work, including performing industrial pipe and sewer-cleaning services.  PSC has experience in closed-circuit television ("CCTV") inspection, cleaning, and removal and disposal of waste in municipal sewer rehabilitation projects.  PSC bid on municipal project work in Los Angeles County on several occasions prior to entering into its contract with SAK to work on the Project.

When the District elicited bids for the Project, it circulated specifications of the sewer rehabilitation work it sought to have completed.  SAK prepared a bid as the general contractor on the Project, and obtained bids from several potential subcontractors, including PSC, to perform the attendant inspection, cleaning, waste removal, and waste disposal work on the Project. Ultimately, SAK was the winning bidder on the Project.

On January 14, 2010, SAK and PSC entered into an ("Agreement") for PSC, as SAK's subcontractor, to provide certain services on the Project.  The Agreement did not indicate a start or completion date for the anticipated work.

Under the terms of the Agreement, PSC agreed to perform "Subcontract Work" that included pre-cleaning of Project sewers, CCTV inspection of the sewers, and waste removal and disposal.  The Agreement stated that PSC would perform its Subcontract Work under the general direction of SAK, would cooperate with SAK so that SAK could fulfill its obligations to the District, and would "provide Subcontract Work for the Project in accordance with the Progress Schedule to be prepared by [SAK] after consultation with [PSC], and as it may change from time to time."  The Project Bid proposed by PSC was incorporated into the terms of the Agreement. According to the terms of the Project Bid prepared by PSC, SAK agreed to pay $245,694.60 for PSC's services.  The Agreement provided for PSC's performance of its work on the Project as follows:

> **8.2 SCHEDULE** In consultation with Subcontractor, the Contractor shall prepare the schedule for performance of Contractor's work (Progress Schedule) and shall revise and update such schedule, as necessary, as Contractor's work progresses. Subcontractor shall provide Contractor with any scheduling information proposed by Subcontractor for Subcontract Work and shall revise and update as Project progresses.  Contractor and Subcontractor shall be bound by the Progress Schedule.  The Progress Schedule and all subsequent changes and additional details shall be submitted to Subcontractor reasonably in advance of required performance.  Contractor shall have the right to determine and, if necessary, change the time, order and priority in which various portions of Subcontract Work shall be performed and all other matters relative to Subcontract Work.

The Project Bid proposal ,prepared by PSC Service Line Manager Erik Halden, and submitted by PSC, included a $5,000 mobilization charge.  The proposal stated that the mobilization figure was "based on working thru all bid items until complete, if client is requesting us to pull off and return at a later date an additional mobe [sic] will apply."  Halden was informed that the work would be conducted in phases, and that PSC would have several mobilizations [ECF No. 25-2, p. 11].  In accordance with this Project Bid proposal term, SAK

3

paid the contemplated mobilization charges to PSC on at least nine occasions during the Project's progression, each time paying PSC an additional $5,000. [ECF No. 25-5].

Section 12.1 of the Agreement addressed failure of performance under the contract by PSC.  Under the terms of Section 12.1, PSC was provided three (3) working days following receipt of notice from SAK, to satisfy any identified contractual deficiencies, or to commence and continue satisfactory correction of any default with diligence or promptness.  This section further provided that, upon PSC's failure to satisfy any identified contractual deficiencies in a timely fashion, SAK would "have the right to take whatever steps it deems necessary to correct deficiencies and charge the cost thereof to [PSC]."

Section 12.4 of the Agreement provided:

> **12.4 TERMINATION BY SUBCONTRACTOR** If Subcontract Work has been stopped for thirty (30) days because Subcontractor has not received progress payments or has been abandoned or suspended for an unreasonable period of time not due to the fault or neglect of the Subcontractor, then Subcontractor may terminate this Agreement upon giving Contractor seven (7) days' written notice. Upon such termination, Subcontractor shall be entitled to recover from Contractor payment for all Subcontract Work satisfactorily performed but not yet paid for including reasonable overhead, profit and attorneys' fees, costs and expenses, subject to the terms of Paragraph 10.2.  Contractor's liability for any other damages claimed by Subcontractor under such circumstances shall be extinguished by Contractor pursuing said damages and claims against Owner, on Subcontractor's behalf, in the manner provided for in Paragraph 12.2 of this Agreement.

SAK referred to each area, stretch, or phase of sewer pipeline and siphons to be rehabilitated as a "Shot" on the Project.  The Project consisted of sixteen Shots.  Service Line Manager Erik Halden, who supervised PSC's work on the Project, understood that PSC would inspect, clean, and remove and dispose of debris in one sewer line to prepare the sewer for SAK's installation of the CIPP lining.  If PSC did not complete its cleaning of a given line, SAK

4

would be unable to install the rehabilitative lining.  SAK was responsible for installing the rehabilitative liner into the sewer pipe.

During the relevant time period, Casey Smith was SAK's Area Manager West.  The Project Manager on the District's Project was SAK employee Jeff Rubio.  John Wolf was PSC's Regional Vice President for National Lines and Gulf Coast Industrial Services.  PSC Line Manager Erik Halden's direct supervisor, Ellen Morgan, was General Manager of PSC's Benica office.

Work on the Project commenced in December 2009.  Throughout the course of the work, Project Manager Jeff Rubio submitted updated schedules setting the dates when work was to progress.  These schedules were commonly referred to as "30 day outlooks," and planned the dates when work was to be performed, and estimated the expected dates for completing the various uncompleted Shots.  SAK paid PSC for all Subcontract Work it performed.

After PSC completed its work on Shot No. 14 on November 17, 2010, only one Shot on the Project remained to be rehabilitated.  This final Shot, No. 8, was a large diameter siphon located fifty feet below the surface under an interstate in the City of Downey, in Los Angeles County.  Shot No. 8 was reflected as a separate "line item" (Bid Item No. 12) in the District's specifications and in the Agreement.  In the Proposal submitted by PSC, and incorporated into the Agreement, Bid Item 12 concerned the work to be performed on Shot No. 8.  The siphon on Shot No. 8 was expected to be one of the most difficult to clean and line.  PSC was to be compensated for its work on Shot No. 8 on a per-cubic-yard-of-waste-disposed basis, rather than the linear-feet-of-pipe-cleaned basis used for the other Shots on the Project.

5

In 2010, the City of Downey, California, implemented a holiday moratorium that precluded work within the city from Thanksgiving to the new year.  Cleaning on Shot 8 was to resume on January 5, 2011.

Discussions concerning PSC's service line, including whether PSC would continue in the sewer cleaning business, occurred in December 2010.  PSC's General Manager Ellen Morgan, Regional Vice President John Wolf, and Service Line Manager Erik Halden met sometime during late December 2010 or early January 2011.  During this meeting, a decision was made that PSC would no longer perform linear footage work for municipal services in 2011.

Following the 2010 Christmas holiday season, a storm caused a back-up in the District's sewer system near Shot No. 8, causing a safety alarm to sound.  Due to safety concerns relating to the amount of storm water in its system, the District communicated to SAK that no underground work on the Project could be carried out during the rainy season, and that work on the final Shot would resume on April 18, 2011.

On January 3, 2011, SAK Project Manager Jeff Rubio sent an e-mail to PSC General Manager Ellen Morgan, and PSC Service Line Manager Erik Halden, informing them that work on the Project was suspended until mid-April, and attaching a copy of the District's communication that explained the safety concerns and indicated the date the work would resume.

Subsequently, Erik Halden told SAK's Area Manager West Casey Smith in mid-January that PSC would not complete work on Shot No. 8, and that PSC was "getting out of the municipal sewer cleaning business."  On March 3, 2011, counsel for SAK wrote a letter to PSC, indicating that SAK was requiring full performance of PSC's work on the terms provided in the Agreement, including cleaning the siphon reach on Shot No. 8 (Bid Item No. 12).  Thereafter, PSC's corporate counsel sent SAK a letter, dated March 9, 2011, stating, in relevant part:

To date, 110 days have passed since PSC was last engaged in earnest by SAK to perform work in connection with the aforementioned project.  Given that SAK has since been unable to provide PSC with a reasonably reliable date of reengagement, please consider this correspondence as written notice, pursuant to Section 12.4, to terminate this Agreement.

SAK's counsel wrote another letter to PSC on April 4, 2011, reiterating a previous request for mediation to resolve the matter, if  PSC continued to refuse to finish its work on the Project, and stating that PSC needed to commence work on April 18, 2011.  However, PSC performed no further work on the Project after November 17, 2010.

## II.  PROCEDURAL BACKGROUND

SAK filed its Complaint, containing claims for breach of contract and unjust enrichment, against PSC in state court on or about July 15, 2011, alleging damages caused by PSC's failure to complete its obligations pursuant to the Agreement [ECF No. 4].  On August 25, 2011, PSC filed its Notice of Removal to this Court pursuant to 18 U.S.C. §§ 1441 and 1446, on grounds of diversity of citizenship as provided in 28 U.S.C. § 1332, and PSC filed its Answer to SAK's Complaint on August 26 [ECF Nos. 1, 5].  Thereafter, following the parties' completion of discovery, SAK filed its Motion for Summary Judgment on June 8, 2012 [ECF No. 23].

## III. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"

*Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Assoc'd Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the

8

non-moving party that would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## IV.  ANALYSIS

In its Motion, SAK contends that it is entitled to judgment as a matter of law on its breach-of-contract claim, because PSC breached their Agreement by failing to complete its subcontract work on Shot No. 8 [ECF Nos. 23, 24]. SAK further contends that "PSC's eleventh-hour attempt to effect 'termination' of the Agreement, pursuant to Paragraph 12.4, was ineffective, improper, and unsupported by the undisputed circumstances[,]" and that PSC's refusal to complete work on Shot No. 8 constituted a breach, rather than a termination, of PSC's obligations.

The Agreement does not contain a choice-of-law provision. Both California and Missouri have an identifiable interest in this case. However, the elements of a claim for breach of contract are substantially indistinguishable under the law of either state. *See C-H Bldg. Assocs., LLC v. Duffey*, 309 S.W.3d 897, 899 (Mo. App. W.D. 2010) (to prevail on breach-of-contract claim under Missouri law, plaintiff must establish: 1) existence of valid contract; 2) defendant's obligation under the contract; 3) a breach by the defendant of that obligation; and 4) resulting damages); *McKell v. Washington Mut. Inc.*, 142 Cal.App.4th 1457, 1489 (2006) (elements of breach-of-contract claims under California law include: 1) existence of contract; 2) plaintiff's performance or excuse for failure to perform; 3) defendant's breach; and 4) damage to plaintiff resulting therefrom). Consequently, this Court need not engage in an extensive choice-of-law analysis because there is no outcome determinative conflict between the laws of the two

9

states.  *See Best Buy Stores, LP v. Benderson-Wainberg Assocs., LP*, 668 F.3d 1019, 1026-27 (8th Cir. 2012).

Thus, to be entitled to summary judgment on its breach-of-contract claim, SAK must show that there was no genuine dispute to the material facts establishing that: 1) SAK and PSC entered into a contract; 2) SAK performed, or substantially performed its obligations pursuant to the contract's terms; 3) PSC failed to perform something the contract required it to do; and 4) SAK was harmed by that failure. *See City of Mt. Pleasant, Iowa*, 838 F.2d at 273; *C-H Bldg. Assocs., LLC*, 309 S.W.3d at 899; *McKell*, 142 Cal.App.4th at 1489.

The Court finds that SAK met its initial burden.  Both parties agree that they entered into the Agreement. [ECF No. 25, p. 3 ¶ 14; No. 25-3, pp. 24-28; No. 28, p. 6].  Both parties also agree that SAK paid PSC for all subcontract work it performed on the Project [ECF No. 25, p. 8, ¶ 58; No. 28. p. 10].  It is undisputed that, during the duration of the Project work, SAK submitted updated schedules, or "30 day outlooks," setting dates when work was to progress [ECF No. 28 ¶24; No. 32].  The plain language of the Agreement shows that the work to be performed on Shot 8 was something the Agreement required PSC to do [ECF No. 25-3].  Both parties agree, and the record shows, that PSC performed no work on Shot 8.  As well, the record establishes that SAK was harmed by PSC's refusal to perform work on Shot 8, as SAK submitted exhibits showing that it incurred costs and expenses in excess of $200,000, to complete the work on Shot No. 8 after PSC refused to do so [ECF Nos. 25, ¶¶ 64-69; 25-6; 25-7; 25-8; 25-9; 25-10, 25-11; 25-12; 28; 28-12].

Having concluded that SAK met its initial burden, this court must review the record to determine whether PSC, as the non-movant, has identified, by reference to affidavits, deposition transcripts, or specific exhibits, sufficient facts that would be admissible in evidence in the event

of trial, from which a rational trier of fact could find for PSC.  *Anderson*, 477 U.S. at 249; Fed. R. Civ. P. 56(e).  To demonstrate a genuine issue for trial, PSC must produce a factual predicate from which a reasonable inference may be drawn that PSC's March 3 notice justifiably terminated the parties' Agreement in accordance with Section 12.4, because its Subcontract Work had been suspended for an unreasonable time.  *Fru-Con Construction Corp. v. Sacramento Municipal Utility Dist.*, 2008 WL 8778970 at \*\*10-11 (E.D. Cal. March 28, 2008).

In its Memorandum in Opposition to SAK's Motion, PSC argues that summary judgment should be denied on the issue of liability because issues of fact exist as to whether PSC breached the terms of the Agreement.  PSC claims that suspensions were initially considered by the parties when they entered into their Agreement, and states that, because both parties considered the duration of the Project to be an essential element of the Agreement, Section 12.4 granted PSC the right to terminate the contract if the Project was suspended for an unreasonable period of time.

PSC states that, according to a final schedule sent to it by Jeff Rubio, PSC met, or exceeded, the deadlines for its work on the Project Shots completed by November 2010.  PSC further states that PSC planned to return to the Project to complete Shot 8 on January 5, 2011.  PSC asserts, however, that it elected to exercise its termination right in January 2011, because PSC had been informed for a third time that the Project was suspended, and PSC deemed the suspensions to be unreasonable.  PSC claims that Erik Halden informed Casey Smith of its decision in January of 2011, and that PSC provided written notice of its intention to terminate the Agreement, by letter dated March 9, 2011.  PSC argues that it exercised its right to terminate its contract with SAK, in accordance with Section 12.4, after work on the Project was suspended in January of 2011, asserting that, consequently, its refusal to complete work on Shot No. 8 was not a breach of the Agreement's terms.

11

The first paragraph of the parties' Agreement states that PSC would perform its work under SAK's direction, that it would cooperate with SAK so that SAK could fulfill its obligations to the District, and that it would provide its work in accordance with the Progress Schedule prepared by SAK after consultation with PSC, "and as it may change from time to time."

Section 8 of the Agreement addresses the time for performance of the work contemplated by the parties. Section 8.1 of the Agreement states that "[t]ime is of the essence for both parties[,]" and that the parties "agree to perform their respective obligations so that the Project may be completed in accordance with this Agreement." Section 8.2 of the Agreement concerns scheduling for the performance of PSC's work on the Project, and states that, SAK, in consultation with PSC, would prepare a Progress Schedule, and that SAK would revise and update the schedule, as necessary, as work on the Project progressed. Section 8.2 also states that SAK had the right to determine, and, if necessary, change, the time in which various portions of the Subcontract Work should be performed. Not only do the terms of Section 8.2 reveal that the parties contemplated schedule changes, the section also grants SAK the authority to make any necessary scheduling changes.

The undisputed facts and unrefuted exhibits set forth facts showing that SAK prepared, revised, updated, and distributed Progress Schedules concerning the performance of PSC's work, and that the revised schedules changed the time, order and priority in which various portions of PSC's work would be performed. The record also shows that, when PSC completed Shot 14 on November 17, 2010, both parties were performing in accordance with the most recently revised and updated Progress Schedule, and that only the work on Shot 8 was left to be performed.

12

Further, the record establishes that PSC planned to return to work on the Project "when it was slated to resume on January 5, 2011."

PSC claims that it was justified in terminating the Agreement under Section 12.4 of the Agreement.  From this assertion flows PSC's argument that, having given its written seven-day notice of termination on March 9, the Agreement was no longer in effect after the time for notice expired, and consequently, PSC was no longer obligated to perform further Subcontract Work on the Project when work on the Project resumed in April.

Under the circumstances presented, PSC's right to terminate pursuant to Section 12.4 requires a determination that its Subcontract Work on the Project had been "abandoned or suspended for an unreasonable period of time not due to the fault or neglect of [PSC]."

PSC argues that SAK cannot prevail on its Motion because "California and Missouri law both require findings by a trier of fact to determine whether a duration of time is 'unreasonable' under the circumstances for that particular case."  This assertion is true, if the facts are in dispute. *See Kopp v. Home Furnishing Ctr., LLC*, 210 S.W.3d 319, 326-27 (Mo.App. W.D. 2006) ("On disputed facts, where fair-minded persons could disagree, what constitutes a reasonable time under a contract is a jury question."); *Pan Asia Venture Capital Corp. v. Hearst Corp.*, 74 Cal.App.4th 424, 433 (1999); *Detmer v. Miller*, 220 S.W.2d 739, 743 (Mo. App. 1949) (what constitutes a reasonable time for performance of contract is question for jury if facts are in dispute).

However, if the evidence on the sequence of events or circumstances leads to only one reasonable disposition, then the question is one of law, and summary judgment may be appropriate.  *See Pan Asia Venture Capital Corp.*, 74 Cal.App.4th at 433 (issue of fact can become issue of law when reasonable minds can draw only one conclusion from the evidence);

13

*ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. 1993)

(non-movant must show genuine dispute as to facts underlying movant's right to judgment;

genuine issue exists where record contains competent materials that evidence two plausible, but

contradictory accounts of essential facts); *Stark v. Shaw*, 317 P.2d 183, 185 (Cal. App. 1957)

(finding that the circumstances surrounding parties' entry into contract supported an inference

that construction would start promptly; holding that under such factual setting, arbiter of fact

could properly conclude that a reasonable time for starting construction expired on date more

than two months after contract was made).

### A. <u>Relevant Time Period for Determining Reasonableness of Work Suspension</u>

Here, there is no genuine dispute as to the facts concerning the suspension of PSC's

subcontract work between January 5 and April 18, 2011.  The record establishes that the District

postponed the work on Shot No. 8 due to safety concerns regarding flow diversions during the

rainy season.  Apparently, in an attempt to create a factual dispute and to bolster its claim that its

work on the Project had been suspended for an unreasonable period of time, PSC alleges facts

concerning two work suspensions it states occurred between March 12 and April 12, 2010, and

during the holiday season between Thanksgiving of 2010 and January 1, 2011.  In its argument,

PSC claims that, after receiving the notice of a third suspension on January 5, 2011, it deemed

the suspensions to be unreasonable, and PSC says that it made its decision that it "would not

return to the Project due to the repeated suspensions."  PSC's argument is not persuasive.

As an initial matter, the Court notes that the events prior to November 17, 2010, are not

relevant to the questions of contractual breach or justified termination under consideration.  The

undisputed facts concerning the parties' conduct prior to that date show that both parties were

acting substantially in compliance with the terms of the Agreement and that both were enjoying

14

the benefits of their Agreement.  The undisputed facts further show that SAK submitted updated

schedules referred to as "30 day outlooks," setting the dates when work on the Project was to

progress, and that both parties endeavored to perform in accordance with the monthly revised

schedules.  Prior to its last day on the Project, November 17, 2010, PSC performed its

Subcontract Work on all the completed Shots, and received the compensation promised for its

work.  SAK paid PSC, in accordance with the Agreement, for all the work PSC performed, and

received PSC's sewer cleaning services on the completed Shots.

PSC correctly states that the parties contemplated the occurrence of work delays and

suspensions when they entered into their Agreement.  The Agreement's provision granting SAK

the authority to determine and change the scheduling of the Subcontract Work confirms this

assertion.  Additionally, the record establishes that PSC was informed that the work would be

conducted in phases.   Furthermore, the Project Bid proposal provided for PSC to receive

additional compensation for mobilization expenses if SAK requested PSC's crew to pull off the

Project job site and return at a later date, and the record shows that SAK paid PSC the additional

mobilization charges on several occasions.

In its Memorandum in Opposition to Summary Judgment and its Statement of Facts, PSC

states that after returning to work on April 12, "PSC performed its work on the Project until

November 2010[,]" and that "[a]s of November 17, 2010, PSC had timely completed its

scheduled work." [ECF No. 28, pp. 15-18, 25].  The undisputed, or unrefuted, facts show that

any contractual breach or work suspension occurring prior to November 17, was either

substantially cured, waived, or not deemed material enough to justify termination by either party.

*See Dicon, Inc. v. Marben Corp.*, 618 F.2d 40, 43-44 (8th Cir. 1980) (normal presumption is to

infer that in deciding upon contractual performance, parties took into account possibility of delay

15

arising from known conditions; by engaging in conduct inconsistent with contractual right, party waives right to challenge on that basis).  Significantly, PSC submitted no evidence of any objections it presented to SAK regarding any previous suspension prior to PSC's present claim of unreasonable delays.

In its March 9 letter giving notice that it was terminating the Agreeement, PSC claimed its inability to complete its work on Shot No. 8 stemmed from SAK's instruction to suspend all work and remove PSC's equipment from the job site, stating, "To date, 110 days have passed since PSC was last engaged in earnest by SAK to perform work[.]"  Hence, when PSC announced its decision, the period of suspension it deemed to be unreasonable included only the time between PSC's last day of work on the Project and the scheduled January 5, 2011 date for work on Shot No. 8 to resume.  Accordingly, the Court finds any work delay or suspension prior to November is not relevant to its determination as to whether PSC's Subcontract Work was suspended for such an unreasonable period of time as to give PSC the right to terminate the parties' Agreement.

It is undisputed that work on Shot 8 of the Project was suspended between Thanksgiving of 2010 and New Year's Day of 2011, due to the City of Downey's holiday moratorium on work involving lane closures, and that work on Shot 8 was scheduled to resume on January 5, 2011. However, the record also contains unrefuted evidence that other work on the Project could have been performed by PSC, and that SAK requested PSC to fulfill other work obligations during this period.  On November 29, 2010, Jeff Rubio sent an e-mail to PSC to determine why some waste bins had not been removed from the site.  In this e-mail, Rubio directed PSC to move the bins from the yard as soon as possible, to clean up a spilled debris disposal PSC left at the yard, and to restore some asphalt that had been damaged when PSC bins were moved around the yard [ECF

16

No. 25-2, pp. 51, 63-67].  On that same date, PSC employee Rhonda Wilber responded that PSC would "move as quickly as possible," and she thanked Rubio for his patience, stating "this has been way out of the normal time frames" [ECF No. 25-2, p. 63].

The unrefuted evidence further shows that members of PSC management engaged in discussions about discontinuing its municipal sewer cleaning service line in December of 2010, and that these members made a business decision that PSC would discontinue this service line during a meeting that occurred sometime in December of 2010 or January of 2011 [ECF No. 25-2, pp. 36-39; ECF No. 25-3, pp. 13-16].  The uncontradicted evidence also indicates that when the discussion occurred, the service line's work commitments included the executed contract with SAK and bid proposals submitted to four other customers [ECF No. 25-3, pp. 14-16].  The uncontroverted evidence shows that, prior to January 5, 2011, PSC decided that, although it would complete the executed contract with SAK, it would contact the four other customers and inform them that PSC no longer desired to perform municipal services linear footage work [ECF No. 25-3, pp. 13-16].

This Court finds that the facts set forth as undisputed by PSC, its arguments opposing summary judgment, and all inferences that may be drawn from those facts and arguments, rebut PSC's present claim that it deemed the City of Downey's holiday moratorium to be an unreasonable suspension justifying cause for termination.  In its pleadings and submitted Statement of Facts, PSC repeatedly states that, until it received SAK's January 3 communication regarding suspension of work on the Project until mid-April, PSC planned to return to the Project as scheduled on January 5, 2011, to complete its work on Shot No. 8.  This stated intention, and all inferences that may be drawn from it, leads only to the conclusion that PSC did not regard any conduct occurring prior to January as a material breach sufficient to excuse PSC's performance

17

under the Agreement.  *See Pan Asia Venture Capital Corp.,* 74 Cal.App.4th at 433; *ITT Commercial Fin. Corp.*, 854 S.W.2d at 382.

PSC's assertion that it found the holiday delay in conjunction with the District's subsequent safety suspension, to be unreasonable, likewise is unavailing.  The unrefuted evidence shows that, although PSC was informed of the District's suspension no later than January 5, 2011, PSC did not attempt to exercise its termination rights by providing the required seven days written notice until March 9, 2011, more than two months after being informed of the postponement.  Further, the unrefuted evidence shows that PSC did not provide this notice until *after* it received SAK's March 3 letter, in which SAK notified PSC, in accordance with Section 12.1 of the Agreement, that SAK was requiring full perfomance of PSC's contractual obligations and would pursue all available remedies for breach if PSC refused to continue its work.

Under such a factual setting, the relevant duration for determining whether PSC's Subcontract Work on the Project was "suspended for an unreasonable period of time" is the time period between January 5 and April 18, 2011.

**B.  Was PSC's Subcontract Work Suspended for an Unreasonable Period of Time?**

The record evidence reveals no genuine dispute as to the facts of the January work suspension that are material to determining whether PSC's refusal to perform work on Shot No. 8 was a contractual breach or a justified exercise of its right to terminate the Agreement.  Because the Court finds that the evidence of the events and circumstances leads to only one reasonable disposition, the question of whether the duration of the January work suspension constituted an unreasonable time is one of law.

It is undisputed that work was scheduled to resume on January 5, 2011, and that Jeff Rubio e-mailed Ellen Morgan and Erik Halden on January 3 to inform PSC that work would be

18

delayed until April.  Nor is it disputed that Jeff Rubio forwarded to PSC the District's notice, which stated that no underground work on the Project could be carried out during the rainy season due to safety concerns relating to the amount of storm water in its system, and that work on the final Shot, No. 8, would resume on April 18, 2011.  The record shows that the work on Shot No. 8 was considered to be the most difficult, and that the work involved cleaning a large diameter siphon located fifty feet below the ground surface under an interstate highway.

In its Memorandum in Opposition, PSC candidly states the District decided to suspend all work on the Project when sewer pipes backed up after a rain storm and caused an overflow on to city streets near a water treatment plant.  PSC further states that the District "suspended all work until after the rainy season as it was fearful of another overflow or the potential danger to workers who would be working in the sewer pipes" [ECF No. 28, p. 4].

Under the nature of the contract and the factual setting presented, reasonable minds could draw only one conclusion, and this Court finds that a three-month suspension of work imposed due to concern for the safety of PSC's and SAK's workers does not constitute an unreasonable period of time.  *See Reichert v. Gen. Ins. Co. of Amer.*, 442 P.2d 377, 381 (Ca. 1968); *Union Wholesale Lumber Co. v. Milne Lumber Co.*, 25 S.W. 464, 466 (Mo. App. 1923).

The Court will grant SAK's Motion for Summary Judgment, as to the issue of liability only, on its claim for breach of contract.  Because the Court has determined that SAK has established it is entitled to judgment as to the issue of liability in its breach-of-contract claim (Count I of SAK's Complaint), SAK's alternatively pleaded unjust enrichment claim (Count II) will be dismissed without prejudice.  *See California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of CA, Inc.*, 94 Cal.App.4th 151, 172 (Cal.App. 4 Dist. 2001) (quasi-contract action for unjust enrichment does not lie where express binding agreements exist and define parties'

rights); *State ex rel. Scott v. Sanders*, 560 S.W.2d 899, 901 n. 4 (Mo. App. 1978) (where petition declares upon express contract, *Burn Nat. Lock Installation Co., Inc. v. Am. Family Mut. Ins. Co.*, 61 S.W.3d 262, 272 (Mo. App. E.D. 2001) (doctrine of election of inconsistent theories of recovery).  However, as discussed below, PSC has set forth affirmative evidence and specific facts showing a genuine dispute as to SAK's damages calculation.

### C.   Calculation of Damages

PSC also challenges SAK's calculation of damages, averring that SAK is attempting to recover for work that was not included in the Agreement and that PSC would not have been obligated to perform.  In support of this argument and its Statement of Additional Facts concerning the damages calculation, PSC submitted the affidavit of Erik Halden, in which Mr. Halden attests, among other things, that SAK's claimed damages, totaling $422,817.49, include charges for pumping items and post-CCTV expenses that PSC was not contractually obligated to perform; charges for purchases of general safety equipment, fencing and porta-potties that would have been borne by SAK as the general contractor on the Project; and charges for employee labor that would not have been borne by PSC pursuant to the Agreement [ECF No. 28-12].   Mr. Halden also attests that SAK's calculated damages fail to credit PSC an offset of approximately $125,904, to account for the additional compensation PSC would have received from SAK to remove material in excess of the cap of 150 cubic yards for Shot 8.

The Court finds that PSC has, by Mr. Halden's affidavit, set forth specific facts showing that a genuine issue of material fact exists with regard to the amount of damages.  *See Anderson*, 477 U.S. at 249.  SAK's "Response to Defendant's Statement of Additional Material Facts" is not sufficient to refute PSC's showing.  Several times, SAK's answer to a asserted fact merely states -- as it did in response to PSC's statement regarding charges for porta-potties and fencing -

- that PSC's assertion called for a legal conclusion or legal analysis as to the respective contractual obligations of the parties, and that the "Agreement speaks for itself and is the best evidence of the parties' contractual obligations."

SAK has not established that its is entitled to Summary Judgment on its claim for damages.  Therefore, the Court will deny SAK's Motion for Summary Judgment as to the issue of damages.

Accordingly,

**IT IS HEREBY ORDERED** that SAK's Motion for Summary Judgment [ECF No. 23] is **GRANTED in part**, and **DENIED in part**.  The Motion is **GRANTED** as to SAK's Breach of Contract claim (Count I of the Complaint), on the issue of liability only.  The Motion is **DENIED** as to Count I, concerning the issue of damages.  In a separate Order, the Court shall refer this remaining issue to Alternative Dispute Resolution for a period of thirty (30) days to begin immediately.  Designation of Neutral form shall be submitted to Court no later than **September 10, 2012**.  Jury Trial in this matter remains set on a three-week docket beginning **October 15, 2012,** at **8:30 a.m.**

**IT IS FURTHER ORDERED** that SAK's Unjust Enrichment claim (Count II) is **DISMISSED without prejudice**.

Dated this   30th    day of August, 2012.


_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE